THIS DECISION IS CITABLE
AS PRECEDENT OF THE
TTAB

Hearing:
September 22, 2005                          Mailed: 1/23/2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

Centraz Industries, Inc.
v.
Spartan Chemical Company, Inc.

———

Opposition No. 91159335
to application Serial No. 78247599
filed on May 9, 2003

———

Matthew A. Rosenberg and Jeffrey L. Michelman of Blumenfeld,
Kaplan & Sandweiss for Centraz Industries, Inc.

Jody H. Armstrong and Martin Miller of Dinsmore & Shohl for
Spartan Chemical Company, Inc.

———

Before Quinn, Hohein and Walsh, Administrative Trademark
Judges.

Opinion by Quinn, Administrative Trademark Judge:

An application was filed by Spartan Chemical Company,

Inc. to register the mark shown below



for "floor finishing preparations."[1]

———

[1] Application Serial No. 78247599, filed May 9, 2003, based on an
allegation of a bona fide intention to use the mark in commerce.

Centraz Industries, Inc. opposed registration under Section 2(d) of the Trademark Act on the ground that applicant's mark, when applied to applicant's goods, so resembles opposer's previously used and registered mark ICE SHINE for "floor finishing preparations"[2] as to be likely to cause confusion.

Applicant, in its answer, denied the salient allegations of likelihood of confusion.

The record consists of the pleadings; the file of the involved application; and trial testimony, with related exhibits, taken by each party. Both parties filed briefs, and both were represented by counsel at an oral hearing held before the Board.

Opposer, according to the testimony of its president, Dennis Miller, is a manufacturer of cleaning and specialty products, including a line of floor products intended primarily for commercial, institutional and office use. In 1989, opposer launched a floor care product line under marks and trade dress relating to an ice/polar theme, including ICE SHINE brand floor finishing preparations used to shine any tile floor surface. Opposer's floor products now are available for sale directly from opposer through its Internet web site, but until this recent change, the products were sold solely through distributors. End users

_____

[2] Registration No. 2862422, issued July 13, 2004.

2

of the products include retail stores, schools and offices. The products are advertised mainly in trade journals and through industry-wide bulletins.

Applicant, according to Melanie Mance, applicant's assistant advertising manager, is engaged in the formulation and manufacture of specialty maintenance cleaning products for the industrial and institutional markets. The products include ISHINE brand floor finishing preparations that are sold through distributors. The products are advertised in trade publications and through appearances at trade shows. Although the involved application is based on an intention to use the mark in commerce under Section 1(b), and no amendment to allege use was filed, Ms. Mance testified that applicant commenced use of the mark in 2003. Applicant's total sales under the ISHINE mark have exceeded $2 million for the last two years, and advertising expenditures during that time have totalled approximately $100,000.

In view of opposer's ownership of a valid and subsisting registration, there is no issue regarding opposer's priority. King Candy, Inc. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). Thus, the only issue to decide herein is likelihood of confusion.

Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant

to the factors bearing on the likelihood of confusion issue. In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

In any likelihood of confusion analysis, two key considerations are the similarities or dissimilarities between the marks and the similarities or dissimilarities between the goods. Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). These, and other du Pont factors deemed pertinent in the proceeding now before us, are discussed below.

With respect to the goods, as often stated, Board proceedings are concerned with registrability and not use of a mark and, thus, the common identification of goods in the registration and application herein frames the issue. Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); and Canadian Imperial Bank of Commerce v. Wells Fargo Bank, N.A., 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987). Both products are identified as "floor finishing preparations." As identified, the goods are legally identical for purposes of our likelihood of confusion determination. This factor weighs heavily in opposer's favor.

As established by the record, both parties' products are sold to commercial and institutional customers. In at least four cases, the same distributors handle both of the

4

products sold under the ICE SHINE and ISHINE marks. It is reasonable to assume that the parties' commercial and institutional customers will be relatively sophisticated in making their purchases of cleaning products, including floor finishing preparations.

We also note, however, that the identifications of goods are not limited to commercial and institutional customers. Octocom Systems Inc. v. Houston Computer Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990). In the absence of any limitations in the parties' identifications of goods, we must presume that the goods move through all reasonable trade channels for such goods to all usual classes of consumers for such goods. Schieffelin & Co. v. Molson Companies Ltd., 9 USPQ2d 2069, 2073 (TTAB 1989); Morton-Norwich Products, Inc. v. N. Siperstein, Inc., 222 USPQ 735, 736 (TTAB 1984); and In re Elbaum, 211 USPQ 639, 640 (TTAB 1981)["[W]here the goods in a cited registration are broadly described and there are no limitations in the identifications of goods as to their nature, type, channels of trade or classes of purchasers, it is presumed that the scope of the registration encompasses all goods of the nature and type described, that the identified goods move in all channels of trade that would be normal for such goods, and that the goods would be purchased by all potential customers."]. Accordingly, in addition to

the trade channels mentioned above, it must be presumed that the parties' goods will also be sold in retail outlets like grocery stores, drug stores and warehouse merchandisers. Likewise, it is presumed that the goods will be purchased by ordinary consumers, employing nothing more than ordinary care in their purchasing decision.

The factors of similar trade channels and classes of purchasers generally weigh in favor of opposer. In the case of the parties' commercial and institutional customers, their sophistication in making purchasing decisions weighs in applicant's favor. The factor of conditions under which and buyers to whom sales are made is, therefore, neutral, as some customers would be sophisticated in their purchasing decisions, while others might not.

The parties have focused the bulk of their attention on the crux of this controversy, namely, the first du Pont factor involving the similarities/dissimilarities between the marks. We must determine whether opposer's registered mark and applicant's mark, when compared in their entireties in terms of appearance, sound, connotation, and commercial impression are similar or dissimilar. Palm Bay Import, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). The test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are

sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp., 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); and Spoons Restaurants Inc. v. Morrison Inc., 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd unpublished*, No. 92-1086 (Fed. Cir. June 5, 1992).

Additionally, where, as in the present case, the marks are applied to identical goods, the degree of similarity between the marks which is necessary to support a finding of likely confusion declines. Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 1034 (1994).

With respect to appearance, the stylization of applicant's mark gives it a different look from opposer's mark in standard character form. In saying this, however, the stylization of applicant's mark is not striking or otherwise dramatic; thus, prospective purchasers would readily perceive the essence of applicant's mark as "iSHINE."[3]

---

[3] We have compared, of course, opposer's mark to the mark sought to be registered in stylized form. In this connection, however, we also note that applicant, in the text of certain promotional material, consistently refers to its mark as "iShine" in a typed format.

7

As to meaning, we note that opposer's mark is promoted in connection with images of polar bears and diamonds, both of which have an association with "ice." Opposer's mark conveys a cold, clear shine. With respect to applicant's mark, Ms. Mance was solely responsible for creating it. She described her decision as follows (Mance dep., p. 7):

> Well, it's a floor finish, okay? And, you know, you want your floors shiny, so--and I had a cat named Sunshine who I called "Shine" oftentimes. And at the same time I was introducing ISHINE, I came out with the name WHITE SUN. And they just seemed to relate well back into one another since both products would be launched at the same time. And that's pretty much where it came from.

Ms. Mance later indicated that the mark "reflects floor finish that's warm, bright, inviting." (Mance dep., p. 20). Applicant posits that the mark "suggests that application of the product makes the floor proclaim 'I shine!'" (Brief, p. 11). Having reviewed the various meanings set forth by applicant, we remain uncertain as to what specific connotation purchasers will attach to the "i" portion of applicant's mark. Although we are unsure as to the meaning of "i" in applicant's mark, the mark as a whole suggests, just as in the case of opposer's mark, that the use of the product will result in a shiny floor.

What stands out in the comparison between the marks ICE SHINE and ISHINE (stylized) is the similarity in sound. Opposer asserts that the only difference in pronunciation is

"in the first syllable (long 'i' standing alone versus 'is' with a long 'i')." (Brief, p. 9). According to opposer, "[t]his very slight difference in the first syllable is diminished even more, as in ordinary speech, most people will tend to roll the 's' sound from the first syllable into the 'sh' sound beginning with the second syllable." Id. Thus, opposer contends, "the only way to avoid the marks' sounding identical is to carefully annunciate [sic] the 's' sound in ICE." Id. In attempting to avoid the phonetic similarity between the marks, applicant argues that, if properly pronounced, the marks sound different.

The marks are similarly constructed, both beginning with a similar, long "i" sound, followed by the word "shine." There is no correct pronunciation of a trademark, and it obviously is not possible for a trademark owner to control how purchasers will vocalize its mark. Interlego AG v. Abrams/Gentile Entertainment Inc., 63 USPQ2d 1862 (TTAB 2002), citing In re Belgrade Shoe, 411 F.2d 1352, 162 USPQ 227 (CCPA 1969). Thus, we find quite reasonable opposer's assessment that purchasers may roll the "s" sound from the pronunciation of "ice" into the "sh" sound beginning the second syllable "shine." When opposer's mark is spoken as such, the two marks at issue herein sound remarkably similar. Even if opposer's mark is pronounced correctly, with a first syllable "ice," the marks ICE SHINE and ISHINE

sound very much alike.  Inasmuch as the goods may be ordered by phone or recommended by word of mouth, the similarity in sound is an important factor in comparing the marks, especially where, as here, identical products are involved.

Inasmuch as the similarity in sound is so substantial that it outweighs any differences in appearance and meaning, we find that the marks engender similar overall commercial impressions, both conveying, when used in connection with floor finishing preparations, the image of a shiny floor as a result of using the product.

In sum, the similarity between the marks weighs in opposer's favor.

As we indicated earlier, neither opposer's nor applicant's identification of goods contains any limitations on trade channels or classes of purchasers and, accordingly, we must include ordinary consumers as among prospective purchasers of the goods.  In that circumstance, we keep in mind the recollection of these average purchasers who normally retain a general rather than a specific impression of trademarks.  See Sealed Air Corp. v. Scott Paper Co., 190 USPQ 106 (TTAB 1975).

In an attempt to show that the "SHINE" portion of the marks is weak, applicant introduced, as an exhibit to Ms. Mance's testimony, a trademark search report ordered by applicant when it filed the involved application, and

10

conducted by a private search firm.  The report indicates that the accompanying copies of the third-party registrations were obtained from the private firm's proprietary database.

The trademark search report is not credible evidence of the third-party uses or registrations listed in the report. Weyerhaeuser Co. v. Katz, 24 USPQ2d 1230, 1232 (TTAB 1992); and Burns Philip Food Inc. v. Modern Products Inc., 24 USPQ2d 1157, 1159 n. 3 (TTAB 1992), *aff'd unpublished*, 28 USPQ2d 1687 (Fed. Cir. 1993).  Accordingly, the listings therein are not entitled to any probative value.  Even in the absence of this evidence, however, we recognize the common element of the marks, "SHINE," is a term that, as applied to floor finishing preparations, is, at the very least, highly suggestive.  In this connection, both parties tout the "crystal clear shine" imparted by use of their products on floors.  Thus, to the extent that opposer's mark is suggestive, a similar suggestion, as indicated earlier, is conveyed by applicant's mark.

The absence of actual confusion does not compel a different result in the likelihood of confusion analysis. Although each party is unaware of any actual confusion over a two-year period of contemporaneous use of the marks, evidence of actual confusion is not essential to proving a case of likelihood of confusion.  Giant Food, Inc. v.

Nation's Foodservice, Inc., 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983).  This factor is neutral.

In deciding this case, we have given absolutely no weight to opposer's evidence of purported bad faith adoption.  Suffice it to say, opposer's allegations regarding Bruce Link's[4] role in applicant's adoption of the involved mark are far fetched; the tenuous connection drawn by opposer is not supported by the record.

We conclude that consumers familiar with opposer's floor finishing preparations sold under its mark ICE SHINE would be likely to believe, upon encountering applicant's mark ISHINE (stylized) for floor finishing preparations, that the goods originate with or are somehow associated with or sponsored by the same entity.

To the extent that any of applicant's points raise a doubt about our conclusion on likelihood of confusion, doubt on the issue of likelihood of confusion is resolved in favor of the prior user and against the newcomer.  Gillette Canada Inc. v. Ranir Corp., 23 USPQ2d 1768 (TTAB 1992).

**Decision:**  The opposition is sustained and registration to applicant is refused.

---

[4] Mr. Link accepted a sales manager position with opposer. Before assuming his duties, but after he was given access to information about opposer's product, Mr. Link rescinded his job acceptance.  Mr. Link subsequently took a position with applicant as a regional manager.